**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**YUSEF CHRISTOPHER,**<br><br>**Defendant** | Crim. No. 20-491 (KM)<br><br>**OPINION and ORDER** |

The criminal charges against the defendant, Yusef Christopher, arise from the armed robberies of two grocery stores in Newark on the same day. One (the "first robbery") took place at 741 Clinton Avenue, near the intersection of South 15th Street; the other (the "second robbery") took place at 833 South 14th Street, near the intersection of Madison Avenue. For each incident, Mr. Christopher is charged with Hobbs Act robbery, 18 U.S.C. § 1951(a), and using a firearm in relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii). (*See* Indictment, DE 20.) Prior to the charges being brought, the Newark police applied for and obtained from a municipal court judge a search warrant for Mr. Christopher's apartment and an automobile. Pursuant to that warrant, the police seized from the apartment certain items of potential evidentiary value, including white sneakers, a ski mask, hollow point bullets, cellular phones, and some paperwork.[1] (DE 36-8)

Now before the Court is Mr. Christopher's motion (DE 36) to suppress this evidence. The motion asserts that the affidavit in support of the search warrant contained false statements or omissions that the police officer/affiant made knowingly or recklessly. If those faulty statements are excised from the warrant application, he argues, what remains does not set forth probable

---

[1] It does not appear that the government seeks to introduce in evidence any items that may have been found in the automobile.

cause, and the evidence must therefore be suppressed under *Franks v. Delaware*, 438 U.S. 154 (1978). I agree with the defendant that certain material statements in the search warrant affidavit were recklessly, though not necessarily intentionally, false. When they are removed, however, the affidavit nevertheless sets forth probable cause to search. The motion to suppress is therefore denied.

## The *Franks* Framework

It is axiomatic that an application for a search warrant must set forth probable cause to believe that evidence or contraband will be found at the place to be searched. The affiant, commonly a law enforcement officer, will ordinarily present to a judicial officer the results of his or her investigation in the form of an affidavit or other sworn statement. The judicial officer will then apply the probable-cause standard to the statements of fact on the face of that affidavit, and, if appropriate, issue the search warrant.

Generally speaking, a court will presume the validity of information in the affidavit of probable cause in support of a search warrant. *See United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006). Under limited circumstances, however, that presumption can be overcome, and the defendant may challenge the truthfulness of statements in the affidavit. *Id.* Under *Franks v. Delaware*, a twofold showing is required:

- First, that the affidavit contained "a false statement [made] knowingly and intentionally, or with reckless disregard for the truth," and
- Second, that once the allegedly false statement is removed, the remainder of the affidavit "is insufficient to establish probable cause."

*Franks,* 438 U.S. at 156; *see also Pavulak,* 700 F.3d at 665 (quoting *Yusuf,* 461 F.3d at 383–84).[2]  The Court of Appeals for this Circuit has clarified that a

---

[2]     Alternatively, the *Franks* issue may be viewed in the context of the more comprehensive "good faith exception" announced in the later case of *United States v. Leon,* 468 U.S. 897, 104 S. Ct. 3405 (1984). The presumption of good faith is at its zenith when the officer, as is proper, seeks the authorization of a judicial officer by

statement is "reckless" for purposes of *Franks* when the affiant officer "has obvious reasons to doubt the truth of what he or she is asserting." *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000).[3]

### A. Knowing or Reckless False Statements

#### 1. The affidavit and search warrants

Here is the section of the search warrant affidavit setting forth the essential facts constituting probable cause:

> B[1].   On Friday, August 23, 2019, at approximately 12:15 hours the grocery store at 741 Clinton Avenue was robbed at gunpoint. The suspect attired in a black hooded sweater, gray pants with patches on the knees, and white Nike sneakers, entered the store and brandished a silver and black firearm. The suspect ordered the victim place all the money in the registers in a black bag and hand it over. Due to the door leading to the registers being locked, the suspect jumped over the counter, still brandishing the firearm. At this time the suspect takes the bag with the money from the registers and flees the scene, last seen going north bound on South 15th street.

> C[1].   Later that day, at approximately 19:20 hours, a second commercial robbery occurs at 833 South 14th Street, approximately one (1) city block away. During this robbery, the suspect who is attired in the same clothing description besides the pants and a different mask. The suspect appears to have dread locks as the first suspect, the same small silver & black firearm is used. The suspect also appears to be attired in the same black hooded sweater and white "high top" air force Nike sneakers. The

---

applying for a search warrant. Still, an officer's reliance on a warrant may be found unreasonable under four limited circumstances:

> (1) [when] the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit;

> (2) [when] the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;

> (3) [when] the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; or

> (4) [when] the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*United States v. Gallo*, 110 F. App'x 265, 269–70 (3d Cir. 2004) (quoting *United States v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001)). Alternative no. 1 dovetails with *Franks,* and is most relevant here.

[3]      The special case of a misleading omission is discussed at pp. 18–19, *infra*.

suspect again orders the victim to place the money in a bag, while brandishing the same silver and black firearm. The suspect is then observed going down one of the aisles and grabbing a male employee by the neck. The employee is then forced to the front of the store at gun point and the suspect proceeds to take the money. The suspect was observed fleeing the scene running southbound on South 14th Street and running through an alley way in back of the grocery store.

A.  The next day, on August 24, 2019, the Newark Police Criminal Intelligence Unit received a call on the Newark Police "crime stoppers" line. The caller stated that on Friday 8/23/19 Yusef Christopher robbed the store on Clinton Avenue & South 15th Street (during day) then at night robbed the store on Madison Avenue and South 14th Street. Caller also stated that he drives an old while[4] cop looking car, possibly a sable.

B.  On August 26, 2019 I responded to the two (2) grocery stores to conduct a thorough camera canvass. While doing so, I was able to obtain video evidence of the incident which occurred at 741 Clinton Avenue. While at 833 South 14th Street, I asked the owner to review the cameras. Before I was able to do so, the store owner replayed the cameras to the day of the incident, but at 5:57. While playing that video, she stated she thought that the suspect was the person on the video. I then pulled the surveillance footage which she advised me about and footage of the incident. While reviewing the footage from all incidents, I observed several details which matched Christopher. The crime stoppers tip indicated Christopher was responsible for both robberies and the owner of the grocery store provided me with video footage of Christopher in the store without a mask. While comparing the videos. Christopher is observed wearing the same sneakers, same length dread locks, and the same tattoo on hand. I can see Christopher pass the employee money when he was in the store with no mask. In that video, he is observed to have a tattoo on his hand. Further, Christopher responds back to the store with a mask and brandishing a handgun. The hand which he is holding the gun, also has a tattoo on it.

C.  After checking to see what vehicles Christopher was issued summons in, I discovered that he operates a 1997 white Mercury Grand Marquis, bearing New Jersey Registration K79LEM, which also looks like a police car. In that vehicle, Christopher was stopped by police and was also issued summonses in the vehicle. During the review of both incidents, the mentioned vehicle was observed fleeing the scene of the robberies, just minutes after they occurred.

D.  Also while reviewing the footage, the suspects' vehicle appears on the screen multiple times. While reviewing the footage at Grand Oaks School

---

[4]      I read "while" as "white," and the parties do not dispute it.

(Madison/South 16th Street) Christopher's vehicle is observed fleeing the area approximately 3 minutes after the robbery on Clinton Avenue occurs. It shall also be noted, the suspects' vehicle was captured on the city's automatic plate reader captures his vehicle approximately 8 minutes before the second robbery occurs at the intersection of Madison Avenue and South 14th Street. It shall also be noted that while reviewing the footage, the suspect has a visible scar on his forehead, which is not covered. In Christopher's arrest photographs, he is observed to have the same scar on his forehead. ·

E.  Arrest warrants were prepared for Christopher on August 27, 2019 and probable cause was found by Honorable Wanda Nieves, of the Newark Municipal Court. Due to Christopher being on parole, I contacted the New Jersey State Parole office and they informed me that Christopher was staying at 135 Prince Street, Apartment #3B, with his girlfriend Ta'Shea Higgins and her two (2) children. A home visit was conducted by the parole officers on August 2, 2019 which also yielded that Christopher was residing at 135 Prince Street, Apartment #3B. Upon completing the arrest warrants and notifications, surveillance of the location commenced. On August 28, 2019 officers responded to 135 Prince Street in order to see if the vehicle used in the robberies was parked at this location. Officers were successfully able to locate the vehicle on Prince Street and West Kinney Street. The White Grand Marquis was located facing east bound on West Kinney Street, at the intersection of Prince Street.

F.  While checking the City of Newark's Automatic Plate reader system, Christopher's white Grand Marquis was detected going through the intersection of Madison Avenue and South 14th Street on August 23, 2019 at 19:08 hours. This is significant to the investigation because the robbery at 833 South 14th Street (Madison & South 14th Street) occurred minutes after the vehicle was detected on the Automatic Plate Reader. While reviewing the summonses received by Christopher, the following were issued to him as he was operating the 1997 White Mercury Grand Marquis (K76LBM): Summons #819224473 issued on August 12, 2019 for Failure to have his License 39:3-29A and Summons #B19198538 issued on July 19, 2019 for Unlicensed Driver 39:3-10. The above listed summonses are still active and have a pending court date. The summonses also listed are both within the last two (2) months, with the first being issued on the 12th of this month.

(Affidavit in support of search warrant ("SW Aff."), DE 36-5 p. 57).[5]

---

[5]      The two initial paragraphs are lettered B and C, and then the lettering starts over again at A. For clarity, I have changed the designation of the first two paragraphs to B[1] and C[1].

The same underlying facts are submitted in support of two search warrants: one for Mr. Christopher's Prince Street apartment, and the other for the 1997 Mercury Grand Marquis automobile. The search warrant application bears the signature of the affiant, Detective Manolis Pelardis of the Newark Police department. It was executed before the Hon. Ana Esteves, Judge of the Newark Municipal Court, on August 28, 2019, shortly after 12 p.m.[6] Judge Esteves issued the search warrants for the apartment and automobile. The evidence at issue was seized only from the apartment. (*See* Property Evidence Receipt, DE 36-8.)

### 2. Analysis of false statements

The defendant filed a motion to suppress evidence, with exhibits (DE 36); the United States filed a response, likewise with exhibits (DE 39); and the defendant filed a reply (DE 40). I found that the arguments, affidavits, and exhibits were sufficient to warrant an evidentiary hearing on the issue of whether the search warrant affidavit contained knowing or reckless falsehoods. I convened such a hearing on July 28, 2021. (The transcript ("Hearing Tr.") is at DE 44.) The sole witness at the hearing was the affiant on the search warrant affidavit, Det. Pelardis. I have considered the exhibits introduced at the hearing, as well as those attached to the motion papers. Both sides submitted post-hearing briefs. (DE 42, 45; DE 43)[7]

---

[6]     The handwritten times on the two applications are not quite clear, but seem to be 12:10 or 12:15 p.m.

[7]     The validity of the warrant ultimately depends on the evidence presented to the issuing magistrate in the affidavit. *See United States v. Yusuf*, 461 F.3d 374, 388 n.12 (3d Cir. 2006) ("[T]he magistrate is limited to the facts submitted in the affidavit in making a determination of probable cause. Indeed, in reviewing whether the magistrate had a 'substantial basis' to issue the warrant, we are limited to reviewing the affidavit and cannot 'consider information from other portions of the record.'"); *Rainsberger v. Benner*, 913 F.3d 640, 650 (7th Cir. 2019) ("A magistrate can assess only the information that she is given; therefore, in testing the validity of a warrant, we consider only evidence that the magistrate had. And '[i]f an affidavit is the only matter presented to the issuing magistrate . . . the warrant must stand or fall solely on the contents of the affidavit.'"); *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009) ("When, as here, an affidavit is the only evidence presented to a judge to support a

Defendant focuses on three alleged misstatements in the search warrant affidavit, concerning (1) the identification of the car videotaped near the first robbery, (2) a scar on the robber's forehead in security camera footage, and (3) a tattoo on the robber's hand, likewise in security camera footage.[8] (*See, e.g.,* Defendant's Post-hearing Letter Brief (DE 45)). I find that the defendant has sustained his burden of showing that these three statements were recklessly false. I discuss them in order.

---

search warrant, the 'validity of the warrant rests solely on the strength of the affidavit.'")

So why, then, does a *Franks* motion sometimes require an evidentiary hearing? A *Franks* hearing is confined to step 1 of the *Franks* inquiry and is logically and temporally prior to the court's determination of probable cause. On the step 1 issue—whether the search warrant affidavit contains knowingly or recklessly false information—extrinsic evidence may properly be considered. *Rainsberger*, 913 F.3d at 650 n.5 (extrinsic evidence may be considered, for example, on the issue of "whether an officer acted knowingly or recklessly when he prepared the affidavit.") Such extrinsic evidence must, however, be confined to its proper purpose. It is admissible only "with respect to an issue *other than* whether the warrant demonstrates probable cause." *Rainsberger*, 913 F.3d at 650 n.5 (emphasis added). Extrinsic evidence therefore cannot be used, at *Franks* step 2, to bolster the government's showing of probable cause, which must be based on the affidavit (as redacted to remove any knowingly or recklessly false statements).

[8]     The issue is not, strictly speaking, the historicity of these events; it is whether Det. Pelardis, in his search warrant affidavit, was recklessly or purposely untruthful in his description of the photographic evidence. Neither this Court nor Det. Pelardis was present when the automobile passed by, or the robberies took place. Epistemically, then, we are in the same position, and I must make a judgment based on the same information that Det. Pelardis possessed. There is no factual dispute as to what that information consisted of; the dispute is over the interpretation of that evidence, and the recklessness or not of the officer's description of it.

This issue, then, must be distinguished from one involving the extent to which a court might use its own visual perception of a photograph or videotape as a basis to set aside the testimony of an officer who viewed the events firsthand (or to reject on appeal a trial court's findings based on such testimony)—what we might term a "Chico Marx" issue. *See* Transcr., *Scott v. Harris*, 2007 WL 601927 at *54 (Feb. 26, 2007) (127 S. Ct. 468 (2007) (comment by Breyer, J.)). *See* https://www.youtube.com/watch?v=cHxGUe1cjzM.

*a. The white car in the Grand Oaks video, recorded near the first robbery, was the 1997 Mercury Marquis associated with Mr. Christopher.*

The search warrant affidavit (quoted at pp. 3–5, *supra*) cites persuasive evidence that a white 1997 Mercury Grand Marquis, New Jersey registration K79 LEM, was driven by Mr. Christopher at times in July and August 2019. (SW Aff. ¶¶ C, F)[9] The affidavit also states that, minutes after the first robbery, "Christopher's vehicle" appears on surveillance footage near the Grand Oaks Charter School at Madison Avenue and South 16th Street. (SW Aff. ¶¶ D, C) (I will for convenience refer to this as the "Grand Oaks" video.) That corner is approximately one block northwest of the scene of the first robbery, and the Grand Oaks video was originally time stamped about three minutes after the time of that robbery, which was 12:15 pm. The car's license plate is not visible in the video, and the driver cannot be seen. (Hearing Tr. 49–52 and Ex. G19)

The threshold *Franks* issue is easy: The statement in the affidavit was false. The search warrant affidavit identifies the car in the Grand Oaks video as the 1997 Mercury Marquis associated with Mr. Christopher, and states that this car was "fleeing the scene" a few minutes after the first robbery. But the car in the Grand Oaks video could not have been that 1997 Mercury Grand Marquis. The defendant introduced persuasive evidence that, at the time of the first robbery, the Mercury Marquis was impounded elsewhere in Newark.[10] The government conceded even before the hearing, and the officer conceded at the

---

[9]     The search warrant affidavit described, and the government introduced in evidence, three traffic summonses which dated from July and August 2019, all demonstrating that Mr. Christopher was driving the Mercury Marquis at the time. (*See* Hearing Exs. G16A, 16B, 16C) The search warrant referred to only two. As noted in the search warrant affidavit, the car is registered to another individual.

[10]     Defendant submitted the affidavit of a security officer to the effect that the Marquis, having been illegally parked in a Rite Aid lot, was restrained by a "boot" starting at 7:20 am on August 23, 2019, and that it remained booted at the time of the first robbery, i.e., 12:15 pm. Approximately one hour after the first robbery, at 1:09 pm, an individual paid $400 to a Safeway Parking Enforcement employee to have the boot removed. (DE 36-15; admitted in evidence, Hearing Tr. 57) Thus the Mercury Marquis was no longer booted later in the day, when it was surveilled near the site of the second robbery. *See infra.*

hearing, that his identification of this first car had been mistaken. (Hearing Tr. 52)[11]

Moving to the second prong of the *Franks* analysis, I find that the error in the affidavit was reckless.[12] Now it is true, as the government points out, that the car in the video might fit the anonymous tipster's general description of a white, "cop-looking" car. (Hearing Tr. 53) If the affidavit had said no more than that, it would have been accurate, if not strongly probative.

Where the affiant went wrong was in stating, as a fact and without qualification, that the *same* car (*i.e.,* the 1997 Mercury Grand Marquis) was captured on surveillance near the site of the second robbery *and* near the site of the first robbery. Throughout, the affidavit refers indiscriminately to "the suspect's car." The resulting impression is that of an evidentiary iron triangle, comprising the defendant, the first robbery, and the second robbery, all tied together by the common factor of the Mercury Marquis automobile.

The government argues that the affiant was mistaken, but not reckless—*i.e.,* he simply mistook the car in the Grand Oaks video for the 1997 Mercury Grand Marquis. I have inspected the photographic evidence that Det. Pelardis had in his possession at the time of filing the affidavit. The video does not show the driver or license plate, so even if the car in the video resembled *a* Mercury

---

[11]    Below the level of a *Franks* challenge, but still well taken, is the defendant's objection to the word "fleeing," a loaded term. (*See* Hearing Tr. 63–66.) "Fleeing the scene" might be discounted by an experienced judge as a trope of police reports, like "responding to the location." It might, however, carry an implication not justified by the video, which appears to portray a car driving at a normal rate of speed. True, the car was traveling away from the area of the store, but there is no evidence that the suspect was driving that car. In the context of my ruling, however, this objection becomes redundant. I note parenthetically that the same phrase, applied in relation to the suspect's departure from the robberies on foot, seems apt.

[12]    I find no evidence that any misrepresentation was knowing. There was no evidence, for example, that the officer, when he filed the affidavit, knew the car had been booted. In response to the Court's questioning, the officer clarified that this was a private impoundment which occurred without police involvement, and that he learned of it only much later. (Hearing Tr. 55–56). (The security officer's email string contains a reference to calling the police, but that particular email appears to relate to a different car on a different date. (*See* DE 36-15 Ex. A.))

Marquis, the affidavit might have gone too far in identifying it as *the* Mercury Marquis. More fundamentally, however, the car in the video is clearly a mid-sized sedan, while a Mercury Grand Marquis is a full-sized sedan. The officer acknowledged his mistake:

> Q [Defense counsel]. And you know the difference between a Grand Marquis and a Sable, correct?
>
> A [Det. Pelardis]. Yes.
>
> Q. One is larger than the other, correct?
>
> A. I'm not really that good with cars, sir, but I would take your word for of it, that --
>
> Q. Would you agree with me one is a midsize sedan and one is a large sedan?
>
> A. Okay. Yes.

(Hearing Tr. 68)

An officer could err when making an on-the-fly identification of an automobile; anyone could. Here, however, there was ample time to investigate, and the officer was doing no more than describing the contents of a video. The officer filed the affidavit on August 28, 2019, some five days after the robbery. At the hearing, the officer acknowledged that, in the interim, he reviewed the video evidence "multiple" or "quite a few" times. (Hearing Tr. 67) Many people, this Court included, are "not really that good with cars." But such automotive identifications are part of a police officer's toolkit. When the officer possesses a photo of the car and the leisure to investigate, the reviewing magistrate is entitled to conclude that the officer's unqualified identification of the car's make and model is based either on the officer's acquired expertise or the officer's research. Here, however, the officer was admittedly not good at identifying cars and had not done any research. Under such circumstances, the officer had "obvious reasons to doubt" his own unsupported statement that the car in the Grand Oaks video was the 1997 Mercury Grand Marquis. *See Wilson,* 212 F.3d at 783. Neither the "reckless" standard nor the "good faith" principle permits the officer to state facts that he does not possess.

10

I pause to observe, however, that I found Det. Pelardis's testimony, both on direct and cross-examination, to have been candid and forthright. He answered questions directly, and where he had erred, he admitted it. I therefore do not suggest any untoward motive on behalf of the officer, who does appear to have been diligent overall. I find only that the officer was reckless in jumping to a conclusion about the car in the Grand Oaks video.

I therefore accept the defendant's contention that the following were recklessly false: any statements in the search warrant affidavit to the effect that the car in the Grand Oaks video, which was recorded near the first robbery, was the same car as the 1997 Mercury Grand Marquis, which was linked to the defendant and surveilled near the site of the second robbery.

> b. *In security camera video from the convenience store, the suspect has a visible scar on his forehead which is the same scar as the one in Mr. Christopher's prior arrest photos.*

The affidavit also relates that, in "the footage," the suspect is observed to have a visible scar on his forehead. (SW Aff. ¶ D) "Footage," as was apparent from the context and clarified in the hearing, refers to the security camera video from the store where the second robbery occurred. (Hearing Tr. 33–36) The search warrant affidavit relates that the officer reviewed prior "arrest photographs," in which Mr. Christopher had a scar on his forehead, and that this was the "same scar" as the one in the security camera video. (SW Aff. ¶ D; *see* Hearing Ex. G 2A (HIDTA profile, containing arrest photos).)

Under *Franks,* I must determine if the statements regarding the scar are false, and, if so, whether that falsity was reckless or intentional.

I agree that the prior arrest photographs introduced in evidence at the hearing show a scar or mark in the area of the defendant's left eyebrow.[13] (Hearing Tr. 33–34 & Exs. G 2A, 2B (HIDTA profile photos).)

---

[13] There was some dispute as to whether the mark seen in the arrest photo was actually a scar or some other kind of blemish. I find that a reasonable observer could describe the mark as a scar, and I do not find any falsehood, reckless or otherwise, in the officer's word choice. The issue ultimately is not material.

A difficulty arises, however, with respect to the statement in the affidavit that the security videos show a scar on the forehead of the robber. The videos, as well as still frames and blowups from the videos, were introduced in evidence. (Hearing Tr. 33–36 & Exs. G 4a, 12, 13) In testimony, Det. Pelardis stated that it was only after many viewings of the security camera footage that he was able to perceive the scar. The search warrant affidavit, however, simply states as a fact that in the video, "the suspect has a visible scar on his forehead," which is the "same scar" as the one in the arrest photo. (SW Aff. ¶ D)

In court, I viewed the security camera videos and blowups of still frames. After the hearing, at the Court's request, the government furnished an electronic copy of the exhibits, including the security camera videos and still photos. Having reviewed that evidence both in and out of court, I am unable to confirm that there is a scar on the forehead of the robber. The enlargements, as shown in court, seemed to detract from, as much as contribute to, clarity; the whites of the robber's eyes, for example, appear to be improbably square-shaped (perhaps a pixel effect). Any discoloration in the left eyebrow area seems indistinguishable from other discolorations elsewhere. I perceive no neutral basis—other than, perhaps, an inclination to find a match for the arrest photo—to select this particular discoloration as evidence of a scar.

If this were a matter of expert testimony, I might defer further. But this witness claims no particular expertise in the interpretation of photographic evidence.[14] As in the case of the car, the witness and the Court are in the same shoes, looking at the same video evidence. *See* pp. 6–7 n.7, *supra.* On the threshold *Franks* issue of falsity, I must find that the averment of a "visible scar" in the video, which is the "same scar" as the one in the arrest photos, is not factually accurate.

---

[14]    I claim no such expertise, either, and a judge's perceptions, like anyone's, are subject to biases and fallibilities. I do have the advantage of coming to the case from a neutral standpoint, however. At any rate, the buck must stop somewhere—in this case, with me, as the finder of fact.

I also conclude that the falsity was reckless, in the sense that the officer had obvious reasons to doubt the truth of the affidavit's averments regarding the scar. The video evidence of a "visible scar" is at best quite doubtful, and, to my eyes, is not really there at all. The statement that this is the "same scar" as the one in the arrest photo is even harder to justify; even assuming a scar can be detected in the video, it cannot be seen clearly enough to match it to the earlier arrest photo. Again, I need not (and do not) find that the misstatement was intentional, because it was clearly reckless.[15] My own inspection of the photographic evidence as the finder of fact leads me to the conclusion that the officer had good objective reasons to doubt the presence of the scar in the video, not to speak of the identity between the scar in the video and the one in the arrest photos. He presented it, however, as a fact.

I find as follows: The statement that Mr. Christopher's prior arrest photo shows what appears to be a scar on his forehead is factually accurate. However, the statements that the security camera footage shows a scar, and that the scar in the arrest photo is the "same scar" as the one in the video, are recklessly false.

---

[15]     The officer diligently pored over the video evidence in search of what he had already seen in the prior arrest photos. Psychological research has reinforced the commonsense proposition that if we go looking for something, we tend to find it. Such unconscious "confirmation bias" is a well-established phenomenon. But while unconscious bias might negate intent, it does not negate recklessness.

Through the government's presentation there ran a thread of argument to the effect that these representations, even if incorrect, were not really misstatements at all, because any report of a visual observation carries the implication of "it looked like that to me." That is surely true, as a matter of conventional or conversational implicature. An eyewitness, even if stating an observation as a fact, is understood to be relating a perception, which may be flawed. Still, arguments of linguistic pragmatics do not salvage the statements here.

Lest the minimum *Franks* requirement of recklessness be undermined, something beyond the declarant's sincerity must be present. That something is supplied by the "obvious *reasons* to doubt" standard of *Wilson, supra* (emphasis added). The analysis of such reasons requires the affiant, and ultimately the court, to evaluate perceptions in the context of facts.

   c.  *In the security camera video, the robber has a tattoo on his hand.*

The final alleged misstatement presents a closer case than the other two.

The search warrant affidavit states that the suspect in the security camera videos has a hand tattoo, suggesting that the person in two, or possibly all three, videos is the same person:

> While reviewing the footage from all incidents, I observed several details which matched Christopher. The crime stoppers tip indicated Christopher was responsible for both robberies and the owner of the grocery store provided me with video footage of Christopher in the store without a mask. While comparing the videos. Christopher is observed wearing the same sneakers, same length dread locks, and the same tattoo on hand. I can see Christopher pass the employee money when he was in the store with no mask. In that video, he is observed to have a tattoo on his hand. Further, Christopher responds back to the store with a mask and brandishing a handgun. The hand which he is holding the gun, also has a tattoo on it.

(SW Aff. ¶ B)

The officer testified that he viewed the video "many, many times," slowing down and enlarging the images. I have examined the video and enlarged thee freeze-frame images placed in evidence by the government, depicting the suspect's hands, particularly as he reaches over the counter. (Hearing Exs. G 10, 11) The officer testified that in this image, he could "see discoloration on both the suspect's hands, which . . . led me to believe he had tattoos on his hands." (Hearing Tr. 31, 33)

I do not say that a tattoo is definitively ruled out, but the image simply is not clear enough to support the officer's statements in the affidavit. What I was able to see could also have been a shadow, a natural discoloration, or a color distortion in the video process. A comparison of other exposed skin areas in the video seems to show other, comparable discolorations. Aside from a predisposition to believe that the suspect was Mr. Christopher, I can see no

14

substantial basis to identify these particular discolorations as matching tattoos.

The government introduced certain extrinsic evidence on the tattoo issue. Such evidence, while it may not be used to bolster the affidavit's showing of probable cause, may be admissible for another purpose. Here, that purpose would be to demonstrate that the officer/affiant, assuming he erred, did so in good faith, and not recklessly.

The government introduced prior arrest photographs which include a photo of Mr. Christopher's hands, which bear fairly distinctive, if low-contrast, tattoos. (Hearing Exs. G 2C, 2D) The search warrant affidavit does *not* allude to the officer's having seen the tattoo in the prior arrest photos. (Hearing Tr. 71) Thus (looking ahead), this fact would not figure into the court's assessment of probable cause. At the hearing, however, the officer testified plausibly that, at the time, he noted the tattoos in the prior arrest photographs; indeed, he gave this as his reason for focusing on the suspect's hands when reviewing the videos. (Hearing Tr. 28–29) Those prior arrest photos, in the officer's possession at the time, might tend to rebut a finding of recklessness in relation to his perception that the discolorations in the store videos were tattoos.

The officer testified that he had a second reason, also not expressed in the search warrant affidavit, for believing the suspect had a hand tattoo. In two clips from the video of the second robbery, the suspect pulls his sleeves down in an unnatural manner, so as to conceal his hands. (Hearing Tr. 29–30, 69; Hearing Exs. G 4B, 4C) This furtive behavior, the officer testified, suggests that the suspect was hiding something that would identify him. Particularly in connection with the prior arrest photos of Mr. Christopher's hands, an officer might surmise that what the suspect was concealing was a hand tattoo. This extrinsic evidence, too, could work against a finding that any factual error was reckless.

The affidavit's description of the video was nevertheless recklessly false, for the following reasons.

15

First, the affidavit lumps the videos together and states that the suspect had the "same tattoo" in all of them. The video evidence, as noted, would not support any such statement. The materiality of the error is that it would tend to tie the robbery videos together with the video in which Mr. Christopher appears unmasked. It also implies that the officer had a good enough view of the tattoo to determine that it was the "same tattoo" in all of the videos.

He did not. The officer's statement in the affidavit, based on nothing more than a discoloration or smudge in the videos, is so direct and unqualified as to be factually false. The officer states that he has viewed the video, in which the suspect is "observed" to have a tattoo, and that "[t]he hand which … is holding the gun, also has a tattoo on it." (SW Aff. ¶ B) The issuing magistrate was relying, not on the video, but on the officer's description of it in the affidavit. The officer admitted that it would have been easy to place an accurate description of the video in the affidavit, but that he did not do so. (Hearing Tr. 77) The reviewing magistrate's natural interpretation of the affidavit would have been that the officer actually observed the tattoo in the video, that it was photographically documented, and that the images were clear enough to permit the officer to compare them and reach the conclusion that it was the "same tattoo" in each video. So interpreted, as it naturally would be, the statement is false.

The officer had obvious reasons to doubt the truth of his description of the video in the affidavit, because he had the video itself before him. The falsity of the statements, which the officer (but not the issuing magistrate) could discern from the video, was reckless.

   *d. Use of the name "Christopher"*

While the issue was not presented in precisely this manner, the defendant's challenge implies that the affidavit's repeated use of the name "Christopher" to designate the robbery suspect, to the extent it is based on the statements regarding the Grand Oaks video, the scar, or the tattoo, partakes of their falsity. My analysis of probable cause will take that into account; that the

16

affidavit uses the name "Christopher" has no independent evidentiary weight, but must be justified by the other evidence of the robber's identity.

There is, however, one exception, and it is potentially a consequential one. As noted in the affidavit, there is a third video (I will call it the "pre-robbery" video), in which a person identified as "Christopher," unmasked, makes an ordinary purchase at the 833 South 14th Street store, after the first robbery but about 90 minutes before the second robbery:

> While at 833 South 14th Street, I asked the owner to review the cameras. Before I was able to do so, the store owner replayed the cameras to the day of the incident, but at 5:57. While playing that video, she stated she thought that the suspect was the person on the video. I then pulled the surveillance footage which she advised me about and footage of the incident. While reviewing the footage from all incidents, I observed several details which matched Christopher. The crime stoppers tip indicated Christopher was responsible for both robberies and the owner of the grocery store provided me with video footage of Christopher in the store without a mask. While comparing the videos. Christopher is observed wearing the same sneakers, same length dread locks, and the same tattoo on hand. I can see Christopher pass the employee money when he was in the store with no mask. In that video, he is observed to have a tattoo on his hand. Further, Christopher responds back to the store with a mask and brandishing a handgun. The hand which he is holding the gun, also has a tattoo on it.

(S.W. Aff. ¶ B)

This paragraph relates certain evidentiary "details" (the anonymous tip, the tattoo, the clothing and sneakers, the store owner's identification) tending to identify this customer as Mr. Christopher and linking this customer to the other robbery videos. This paragraph also, however, states the affiant's own identification of the person in the pre-robbery video as Mr. Christopher ("video footage of Christopher in the store without a mask"; "Christopher is observed …"). We may even assume *arguendo* that this identification, within the four corners of the affidavit, was unwarranted by the cited corroborating evidentiary "details." Even so, it could not have been reckless.

The affidavit itself reveals that Det. Pelardis possessed the prior arrest photos of Mr. Christopher. He does not refer to the photos in this particular paragraph, but does so elsewhere in the affidavit. (*See* SW Aff. ¶ D (noting scar

on Mr. Christopher's forehead in the prior arrest photo).) His testimony at the hearing confirms that he obtained Mr. Christopher's HIDTA profile, which included those photos. (Hearing Tr. 12–13 and Exs. 2A–2E.) Those clear, full-face arrest photos, even without the corroborative evidence, gave the detective a familiarity with Mr. Christopher's appearance. The pre-robbery video was placed in evidence. (Hearing Ex. G 14, G 15; Hearing Tr. 38–39) In that video, the customer appears unmasked and his face is clearly visible. Det. Pelardes testified that, based on the prior arrest photos, he was able to recognize Mr. Christopher in the pre-robbery video. (Hearing Tr. 39) Given his prior familiarity with Mr. Christopher's appearance, the detective had a good-faith, reasonable basis to conclude that the person in the pre-robbery video was Mr. Christopher. The court's own inspection of the exhibits would bear out the comparison.

The affidavit's use of the designation "Christopher" to refer to the person in the pre-robbery video, even if false (and I am not making such a finding), could not have been recklessly so.

## B. Analysis of Probable Cause Affidavit With False Statements Excised

Step 2 of the *Franks* process, as noted above, is to consider whether the statements found to be false were necessary to issuance of the search warrant—*i.e.,* whether the affidavit, with the false statements excised, nevertheless sets forth probable cause.

### 1. Method of redacting the affidavit

I first consider the form that the redaction of the search warrant should take. As noted above, at *Franks* step 2, the Court must analyze probable cause within the four corners of the redacted affidavit, without extrinsic evidence:

> [T]he magistrate is limited to the facts submitted in the affidavit in making a determination of probable cause. Indeed, in reviewing whether the magistrate had a 'substantial basis' to issue the warrant, we are limited to reviewing the affidavit and cannot 'consider information from other portions of the record.'

*Yusuf*, 461 F.3d at 388 n.12. The necessary implication is that the *Franks* process is not a second chance to write a better affidavit, aided by extrinsic evidence. The affidavit is to be redacted, not corrected or rewritten. As *Yusuf* put it, "[i]f we were to 'correct' the affidavit as suggested by the Government, we would not only be infusing extraneous information into the probable cause determination, but we would also allow the government to receive the benefit of its misconduct." *Id.*

The government appeared at some points to be suggesting that this is an "omission" case. Now in some trivial sense, any false statement is also an "omission" of the truth. The false statements here, however, are not ones that can be remedied by supplying omitted information. The incorrect statements that the officer saw the 1997 Mercury, the tattoo, or the scar cannot be remedied by the *additional* information that he didn't see them. And to *replace* the misleading statements with accurate ones, based on extrinsic evidence, crosses the line to an impermissible rewriting of the affidavit.

At any rate, that is not what the *Franks* case law means when it refers to supplying omitted information. When a defendant establishes that facts necessary to prevent an affidavit from being misleading were omitted, courts have permitted the omitted facts to be supplied for purposes of *Franks* step 2. Then the issue becomes whether, even with the omitted, damaging (to the government) information supplied, the affidavit still sets forth probable cause:

> Additional information may be incorporated into an affidavit only if we determine that a government agent made a material omission. The reason for the distinction between omissions and misrepresentations is that an omission cannot be excised; rather, the omitted information is introduced into the affidavit in order to determine whether the omission was material.

*Yusuf*, 461 F.3d at 388 n.12. That principle does not permit the government to remedy its own "omissions" or improve the probable cause showing in the affidavit with additional facts.

19

Guided by *Yusuf,* then, I will exercise my discretion to simply strike the offending references to the Mercury in the Grand Oaks video, and to the scar and tattoo in the security camera videos.

### 2. The Search Warrant Affidavit as redacted

Here is the facts section of the search warrant affidavit, with the statements found to be recklessly false ~~struck~~:

B[1].  On Friday, August 23, 2019, at approximately 12:15 hours the grocery store at 741 Clinton Avenue was robbed at gunpoint. The suspect attired in a black hooded sweater, gray pants with patches on the knees, and white Nike sneakers, entered the store and brandished a silver and black firearm. The suspect ordered the victim place all the money in the registers in a black bag and hand it over. Due to the door leading to the registers being locked, the suspect jumped over the counter, still brandishing the firearm. At this time the suspect takes the bag with the money from the registers and flees the scene, last seen going north bound on South 15th street.

C[1].  Later that day, at approximately 19:20 hours, a second commercial robbery occurs at 833 South 14th Street, approximately one (1) city block away. During this robbery, the suspect who is attired in the same clothing description besides the pants and a different mask. The suspect appears to have dread locks as the first suspect, the same small silver & black firearm is used. The suspect also appears to be attired in the same black hooded sweater and white "high top" air force Nike sneakers. The suspect again orders the victim to place the money in a bag, while brandishing the same silver and black firearm. The suspect is then observed going down one of the aisles and grabbing a male employee by the neck. The employee is then forced to the front of the store at gun point and the suspect proceeds to take the money. The suspect was observed fleeing the scene running southbound on South 14th Street and running through an alley way in back of the grocery store.

A.  The next day, on August 24, 2019, the Newark Police Criminal Intelligence Unit received a call on the Newark Police "crime stoppers" line. The caller stated that on Friday 8/23/19 Yusef Christopher robbed the store on Clinton Avenue & South 15th Street (during day) then at night robbed the store on Madison Avenue and South 14th Street. Caller also stated that he drives an old whi[t]e cop looking car, possibly a sable.

B.  On August 26, 2019 I responded to the two (2) grocery stores to conduct a thorough camera canvass. While doing so, I was able to obtain video evidence of the incident which occurred at 741 Clinton Avenue. While at 833 South 14th Street, I asked the owner to review the cameras.

Before I was able to do so, the store owner replayed the cameras to the day of the incident, but at 5:57. While playing that video, she stated she thought that the suspect was the person on the video. I then pulled the surveillance footage which she advised me about and footage of the incident. While reviewing the footage from all incidents, I observed several details which matched Christopher. The crime stoppers tip indicated Christopher was responsible for both robberies and the owner of the grocery store provided me with video footage of Christopher in the store without a mask. While comparing the videos. Christopher is observed wearing the same sneakers, same length dread locks~~, and the same tattoo on hand.~~ I can see Christopher pass the employee money when he was in the store with no mask. ~~In that video, he is observed to have a tattoo on his hand.~~ Further, Christopher responds back to the store with a mask and brandishing a handgun. ~~The hand which he is holding the gun, also has a tattoo on it.~~

C.  After checking to see what vehicles Christopher was issued summons in, I discovered that he operates a 1997 white Mercury Grand Marquis, bearing New Jersey Registration K79LEM, which also looks like a police car. In that vehicle, Christopher was stopped by police and was also issued summonses in the vehicle. ~~During the review of both incidents, the mentioned vehicle was observed fleeing the scene of the robberies, just minutes after they occurred.~~

D.  Also while reviewing the footage, the suspects' vehicle appears on the screen ~~multiple times~~. ~~While reviewing the footage at Grand Oaks School (Madison/South 16ᵗʰ Street) Christopher's vehicle is observed fleeing the area approximately 3 minutes after the robbery on Clinton Avenue occurs.~~ It shall also be noted, the suspects' vehicle was captured on the city's automatic plate reader captures his vehicle approximately 8 minutes before the second robbery occurs at the intersection of Madison Avenue and South 14th Street. ~~It shall also be noted that while reviewing the footage, the suspect has a visible scar on his forehead, which is not covered.~~ In Christopher's arrest photographs, he is observed to have ~~the same~~ [a] scar on his forehead.

E.  Arrest warrants were prepared for Christopher on August 27, 2019 and probable cause was found by Honorable Wanda Nieves, of the Newark Municipal Court. Due to Christopher being on parole, I contacted the New Jersey State Parole office and they informed me that Christopher was staying at 135 Prince Street, Apartment #3B, with his girlfriend Ta'Shea Higgins and her two (2) children. A home visit was conducted by the parole officers on August 2, 2019 which also yielded that Christopher was residing at 135 Prince Street, Apartment #3B. Upon completing the arrest warrants and notifications, surveillance of the location commenced. On August 28, 2019 officers responded to 135 Prince Street in order to see if the vehicle used in the robberies was parked at this

location. Officers were successfully able to locate the vehicle on Prince Street and West Kinney Street. The White Grand Marquis was located facing east bound on West Kinney Street, at the intersection of Prince Street.

F.  While checking the City of Newark's Automatic Plate reader system, Christopher's white Grand Marquis was detected going through the intersection of Madison Avenue and South 14th Street on August 23, 2019 at 19:08 hours. This is significant to the investigation because the robbery at 833 South 14th Street (Madison & South 14th Street) occurred minutes after the vehicle was detected on the Automatic Plate Reader. While reviewing the summonses received by Christopher, the following were issued to him as he was operating the 1997 White Mercury Grand Marquis (K76LBM): Summons #819224473 issued on August 12, 2019 for Failure to have his License 39:3-29A and Summons #B19198538 issued on July 19, 2019 for Unlicensed Driver 39:3-10. The above listed summonses are still active and have a pending court date. The summonses also listed are both within the last two (2) months, with the first being issued on the 12th of this month.

(SW Aff., as redacted.) It is to this redacted version of the affidavit that I apply the probable cause standard.

### 3. Analysis of probable cause

The Fourth Amendment requires that the judicial officer who issued the warrant possessed a "substantial basis" to conclude that there was probable cause, *i.e.,* a "fair probability" that contraband or evidence of a crime would be found at the subject premises. *Illinois v. Gates*, 462 U.S. 213 (1983); *United States v. Conley*, 4 F.3d 1200, 1205 & n.2 (3d Cir. 1993); *see also Ornelas v. United States*, 517 U.S. 690, 698 (1996). The probable cause determination embodies a commonsense conclusion from the totality of the circumstances. As the name implies, probable cause involves likelihoods, not certainties, and it is "a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Gates*, 462 U.S. at 231–32.

A search warrant affidavit may incorporate hearsay or indirect evidence. *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (noting that "direct evidence linking the residence to criminal activity is not required to establish probable cause"); *Jones*, 994 F.2d at 1056–57 ("While ideally every affidavit would contain direct evidence linking the place to be searched to the crime, it

is well established that direct evidence is not required for the issuance of a search warrant."). The reliability of hearsay, however, is a "circumstance ... for the magistrate judge to consider in determining whether there was probable cause, *see Illinois v. Gates*, 462 U.S. at 230, 103 S. Ct. at 2328." *Id.*

Where, as here, a warrant affidavit cites information obtained from an anonymous or confidential informant, the issuing judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the judge], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238–39. An informant's "veracity" and "basis of knowledge" are not rigid, independent prerequisites; rather, *Gates* held, they go into the mix of facts to be considered as part of the "totality of the circumstances." *Id.* at 233 (reversing the prior "*Aguilar/Spinelli*" test which required that both prongs be independently satisfied). *See also United States v. Dancy*, No. CR 19-658 (KM), 2020 WL 3446329, at *4–5 (D.N.J. June 24, 2020) (citing standards). Thus, "[a] magistrate may issue a warrant relying primarily or in part upon the statements of a confidential informant, so long as the totality of the circumstances gives rise to probable cause." *United States v. Stearn*, 597 F.3d 540, 555 (3d Cir. 2010).

*Gates* points the way to a finding of probable cause based on corroboration of an anonymous tip. It upheld a warrant based on an anonymous letter alerting the police that two persons, a husband and wife, were dealing drugs, which they stored in their Illinois home. The tip stated that the wife would be driving to Florida on May 3, to be joined by her husband, who would arrive by air, and that the two would return with drugs in the trunk of their car. The police were able to corroborate parts of the tip—primarily, that the husband flew to Florida and joined the wife, and that the two drove north in a car with Illinois plates. Those corroborative facts, although not

incriminating in themselves, were sufficient to justify the issuance of a search warrant for the couple's home and car.

The corroborative facts here, I find, echo and in some respects exceed those found sufficient in *Gates.*

### a. The Crimestoppers telephone tip

Here, the starting point of the analysis is the anonymous Crimestoppers telephone tip. (SW Aff. ¶ A) Its reliability will be scrutinized in the context of all the evidence.

It was on August 24, 2019, the day after the robberies, that an anonymous informant telephoned the Newark police and told them the following:

(a) On Friday, August 23, 2019, during the day, Yusef Christopher robbed the store on Clinton Avenue & South 15th Street.

(b) On the same date, but at night, Yusef Christopher robbed the store on Madison Avenue and South 14th Street.

(c) Yusef Christopher drives an "old whi[t]e cop looking car, possibly a sable."

(SW Aff. ¶ A) Nothing further is known about the informant (Hearing Tr. 59–61), but investigation did corroborate much of the information in the tip.

The information in the tip, to begin with, was fresh, and, like the information in the *Gates* tip, detailed. On August 23, 2019, there had indeed been a robbery of the store at Clinton and South 15th Street, and it had occurred "during the day," at 12:15 pm. On the same date, there had been a robbery of a second store, at Madison and South 14th Street, and it had occurred "at night," at 7:20 pm. (SW Aff. ¶¶ A[1], B[1]) The police obtained security camera videos from the two stores that confirmed the times and dates of the robberies. (*Id.*) The two locations are separated by one city block.

The police also confirmed the informant's tip that Yusef Christopher drove a white, "cop-looking car." (SW Aff. ¶ C) They learned that, on July 19 and August 12, 2019 (eleven days before the robberies), Christopher was issued summonses while driving a white 1997 Mercury Grand Marquis, New

24

Jersey registration K79LEM. (SW Aff. ¶¶ D, F)[16] The search warrant affidavit also relates that on August 28, 2019, the police found the 1997 Mercury Marquis parked on the street near the intersection of Kinney and Prince Streets, just half a block from Christopher's residence at 135 Prince Street. (SW Aff. ¶ E)

A Grand Marquis, although a Mercury, is not a Sable. Nevertheless, the Marquis surely "looks like a police car," as the warrant affidavit specifies. (SW Aff. ¶ C)[17]

> b. *The 1997 Mercury, now tied to Christopher, is captured on a license plate scanner near the second robbery.*

Like the corroboration of the tipster in *Gates,* the car here evidence was not necessarily incriminating in itself. But having tied the 1997 Mercury Marquis to Mr. Christopher, Officer Pelardis was also able to place that car near the second robbery.[18]

---

[16]    The actual summonses were introduced in evidence at the hearing. (Hearing Exs. G 16B, 16C.) Exhibit G 16A is a summons for an earlier, similar stop, on July 6, 2019, which is not referred to in the affidavit.

[17]    Indeed, it might be described as the quintessential "cop-looking car," as it is substantially the same vehicle as the Ford Crown Victoria, widely recognized as a typical police cruiser. I take judicial notice that Ford would sometimes market what was essentially the same car as both a Ford model and a differently named Mercury model. A familiar example would be the Ford Taurus/Mercury Sable. The 1997 Mercury Grand Marquis was, visually and mechanically, a very close sibling to the Ford Crown Victoria. *See* https://en.wikipedia.org/wiki/Mercury_Grand_Marquis ("[From 1979 to 2011], the Grand Marquis and Crown Victoria were functionally identical twins, built together on the same assembly line in Canada with only minor trim styling separating them.") The Ford Crown Victoria is widely recognized as the cruiser of choice for U.S. police departments. https://en.wikipedia.org/wiki/Ford_Crown_Victoria_Police_Interceptor ("From 1997 to 2011, the Ford Crown Victoria Police Interceptor was the most widely used automobile in law enforcement operations in the United States, Canada, and Saudi Arabia."). Wikipedia, by the way, is an appropriate source where the issue, as here, relates to common perceptions or knowledge that might have shaped the informant's description, and where the subject matter does not suggest that a contributor would have a motive to falsify. Used with discretion, it is of value.

[18]    But not the first; *see* Section A.2.a, *supra.*

25

One of the city's automatic license plate readers ("ALPR") clearly photographed the Mercury Marquis and its license plate, NJ K79LEM. The car was scanned going through the intersection of Madison and South 14th Street, the location of the second robbery. The date was August 23, 2019, and the time was about eight minutes before the second robbery. (The second robbery took place at approximately 7:20 pm.) (SW Aff. ¶¶ D, F, C[1])[19]

> c.  *Mr. Christopher is videorecorded making a purchase at the second store, and is tied to the robberies by an employee's identification of him, as well as common hair style and clothing features.*

Det. Pelardis learned that the person named in the anonymous tip, Yusef Christopher, was currently on parole, and obtained his home address, 135 Prince Street, Apt. 3B, from his parole officer. (SW Aff. ¶ E)[20] That address is in the same section of Newark as the robberies, less than two miles distant, as this local municipal court judge would have appreciated. As noted, the 1997 Mercury Grand Marquis was found parked near Christopher's home address.

A critical piece of corroborating evidence concerns Mr. Christopher's visit to the 833 South 14th Street store, not at the time of the second robbery, but

---

I note also that the corroborative information here, unlike the tip in *Gates,* was not predictive. Such information may indicate knowledge or insider status; like a scientific hypothesis, it generates predictions that can be tested against events. Here, the events had already occurred. Nevertheless, the evidence, unlike that in *Gates,* was already fixed in video form at the time of the tip, and therefore not susceptible to *post hoc* manipulation. And it was sufficiently borne out for other reasons, as detailed herein.

[19]   The hearing evidence places the scan at 7:08 pm, which would be twelve, not eight, minutes before the second robbery, an immaterial discrepancy. (Hearing Tr. 42–46; Hearing Ex. G 17)

It is true that the robber in the security camera video arrived and fled on foot. The robber was, however, fairly scrupulous in his precautions, and it would make sense that he would park the car nearby, since it would easily be identified on the store video. At any rate, such alternative possibilities do not detract from probable cause.

[20]   The search warrant affidavit does not state the nature of Mr. Christopher's prior criminal record. The officer might legitimately have considered his parole status as warranting further inquiry.

about ninety minutes before. Det. Pelardis, as part of his investigation, went to that store to review the security camera video and interview the employees. The store owner, before playing the video of the robbery, played a video selection from approximately 5:57 pm. on August 23, 2019. That video (herein, the "pre-robbery video") shows Mr. Christopher, unmasked, making an ordinary purchase for cash. (SW Aff. ¶ B)[21]

Aside from the evidence described above, other evidence gathered by the police corroborated the tipster by supporting the conclusion that Mr. Christopher, depicted in the pre-robbery video, and the robber, depicted in the robbery videos, were the same person.

First, the search warrant affidavit relates that a person working at the 833 South 14th Street store identified the person in the pre-robbery video as the same person who later robbed the store (or rather that she "thought" so).[22] The robbery took place less than 90 minutes later, and she would have had an equal opportunity to observe the physical characteristics, if not the full face, of the masked robber.[23]

---

[21]     The actual pre-robbery video and still photos from that video were introduced in evidence. (Hearing Tr. 38–39; Hearing Ex. G 14 (video); Hearing Ex. G 15 (still photo)) The affidavit's description of the video, though terse, is accurate.

[22]     The affidavit indicates that the witness owned the store, but at the hearing, Det. Pelardis referred to this witness as a store employee. This witness, he testified at the hearing, "informed me that she believed who robbed the store was a frequent [sic] in the store, and she also informed me that she believed that the suspect was in the store approximately an hour and a half before the robbery occurred." (Hearing Tr. 38)

[23]     A lay witness may not be able to break down her perception into components. Many, however—particularly in the COVID era—have had the experience of instantly recognizing a person, despite their being masked, based on a holistic impression of their physical characteristics.

There was no follow-up in the form of a lineup or photo array. The reason was not stated. (See Hearing Tr. 62.) Possibly it would have been regarded as pointless, because the person in the pre-robbery video is readily identifiable as Mr. Christopher, and the person in the robbery video was masked.

No argument was offered regarding "gun focus," fear, or similar impediments to accuracy of eyewitness identifications. For what it is worth, the videos bespeak remarkable *sangfroid* on the part of nearly everyone involved.

Second, there is overlap in the appearance of Mr. Christopher and the robbers. Christopher, in the pre-robbery video, and the robber, in the robbery videos, may clearly be observed to be an African-American male who wore his hair in dreadlocks.[24] (SW Aff. ¶¶ B[1], C[1], B) As the affidavit observes, the persons in the videos have dreadlocks of similar length—not unique, to be sure, but somewhat distinctive.

Third, Mr. Christopher and the suspect wore similar sneakers. The affidavit states that in the videos of both robberies, the suspect is wearing "white 'high top' air force Nike sneakers." (SW Aff. ¶¶ C[1], B); *see also* Hearing Tr. 25.) In the pre-robbery video, the affidavit points out, Mr. Christopher is wearing the "same sneakers." *Id.* Attempting to turn this detail to advantage, defense counsel pointed out that these are the most popular model of the most popular brand of sneaker. (Hearing Tr. 85) The Nike Air Force 1 is indeed a very popular shoe. *See* https://www.nike.com/air-force-1. The Nike Air Force 1s in the video, however, are high tops (other heights and styles are available); and white (other colors are available); with the ankle support straps reversed and hanging down in back (a fashion choice off the basketball court, where ankle support is less critical). In the context of the other evidence, this is an important corroborating detail.

Finally, the police gathered other evidence corroborating the tipster's statement that the two robberies were committed by the same person. As related in the affidavit, the suspect in both robberies was "attired in the same clothing description besides the pants and a different mask"; in particular, the suspect seemed to be "attired in the same black hooded sweater," and, as noted

---

[24]     That identifying information is consistent with the appearance of Mr. Christopher in the HIDTA profile (Hearing Exs. G 2A, 2B), although it could perhaps apply to many other persons as well. It must be taken in context of all the evidence. As noted above, the officer's matching of the scar and tattoo to the store security videos will not be taken into account.

above, the Nike sneakers. Both robberies were committed with the aid of a small silver and black handgun. (SW Aff. ¶ C[1].)[25]

Taken together, these circumstances sufficiently corroborate the anonymous tip that Mr. Christopher committed the robberies, and furnish probable cause for the search warrant.

## CONCLUSION

The issue is probable cause to search, a phase of a criminal investigation aimed at helping the prosecution obtain evidence to meet the later, far higher burden of proof beyond a reasonable doubt. The probable cause showing here, while not offered as evidence of guilt *per se,* depended on connecting Mr. Christopher to at least one of the robberies. Pursuant to *Franks,* I have excised certain statements in the search warrant affidavit pertaining to the Grand Oaks car video, the scar, and the tattoo, as discussed above. What remains, while presenting far from an airtight case, suffices to meet the standard of probable cause to believe that items in Mr. Christopher's apartment, such as clothing, would constitute evidence of crime.

---

[25]     These facts are consistent with the more detailed evidence at the hearing. (*See* Hearing Tr. 21–24 & Hearing Exs. G 5a, 5B, 5C, 6.) I do not consider that more detailed evidence, which is extrinsic to the affidavit, on the issue of probable cause.

I will also clarify that, for purposes of probable cause, I do not here rely on certain other corroborating evidence which was introduced at the hearing by the government but did not appear in the search warrant affidavit:

First, the Mercury Grand Marquis, it turns out, made an appearance in proximity to Mr. Christopher's pre-robbery purchase at the second store, just as it would later at the time of the second robbery. The Mercury Marquis was captured on the city's APLR traveling in the vicinity of 833 South 14th Street at 5:53 pm, and again at 6:00 pm. (Hearing Tr. 46–48; Hearing Exs. G 18A, 18B) The two sightings bracket the interval when Mr. Christopher was in the store making his purchase, from 5:53 to 5:58 pm.

Second, the pre-robbery video shows that Mr. Christopher, after making a purchase, lingered for a while near the exit of the second store. He seems to possess a sheaf of currency, which he is counting or sorting. The time frame is after the first robbery, but before the second.

It is true, by the way, that the robberies were committed in a similar manner. The *modus operandi,* however, seems commonplace, and is not particularly probative as identification evidence.

**ORDER**

For the reasons express in the foregoing Opinion,

IT IS this 1st of September, 2021

ORDERED that the defendant's motion to suppress evidence (DE 36) is DENIED.

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**